RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE  5 / 8 / 14

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


JACQUELINE SMITH-RICHARDSON

VERSUS

CAROLYN W. COLVIN

DOCKET NO.: 1:13-cv-00831

JUDGE JAMES T. TRIMBLE, JR.
MAGISTRATE JUDGE JAMES D. KIRK


REPORT AND RECOMMENDATION

Jacqueline Smith-Richardson ("Smith-Richardson") protectively filed an application for disability insurance benefits ("DIB") on October 28, 2008 (R. 215-218). She alleged a disability onset date of August 20, 2008 (R. 215) due to a work related injury to her back. Her alleged disabilities included bulging discs in her back and neck and degenerative disc disease (R. 254). Smith-Richardson was 45 years old at the time of the filing.

Smith-Richardson's application was administratively denied by the Social Security Administration ("SSA") on January 28, 2009 (R. 117-120). She requested a hearing before an Administrative Law Judge ("ALJ") on February 7, 2009 (R. 121-128). A hearing was held on December 18, 2009 (R. 26-62). Present at the hearing were Smith-Richardson, her attorney and a vocational expert ("VE")(R. 28). According to the ALJ's decision (R. 102-112), Smith-Richardson suffered from the following severe impairments: degenerative disc disease of the cervical spine and mild

degenerative disc disease of the lumbar spine (R. 104).  He found she possessed the residual functional capacity to perform a modified range of light work as defined in 20 C.F.R. §404.167(b) (R. 105).   Specifically, she could lift/carry 20 pounds occasionally, 10 pounds frequently, stand/walk 6 of 8 hours and sit 6 of 8 hours.  However, she could not perform over-the-shoulder work (R. 105).  Accordingly, he concluded she was not disabled (R. 108).

On January 6, 2011, Smith-Richardson requested the Appeals Council review the hearing decision (R. 8-10).  On March 2, 2011, the Appeals Council issued an order vacating the ALJ's decision and remanding the matter to an ALJ (R.113-115).  The Appeals Council advised that the ALJ should consider additional evidence submitted by Smith-Richardson as it raised an issue with respect to whether she could perform light work. The Appeals Council instructed the ALJ to obtain additional evidence, including a consultative examination, existing medical evidence and outstanding records from treating neurologist, to determine the severity of the cervical spine impairment (R. 114-115).  Additionally, the Appeals Council ordered the ALJ to consider Smith-Richardson's maximum residual functional capacity ("RFC") and subjective complaints of pain and provide appropriate rationale regarding both findings.  The ALJ was also given instructions regarding how to proceed if evidence was needed from a VE (R. 114-15).

A *de novo* hearing was held on July 25, 2011 before the same ALJ.  Smith-Richardson, her attorney and the VE from the prior hearing were present.  The ALJ issued a hearing decision on September 6, 2011, wherein he found that Smith-Richardson suffered from the following severe impairments: degenerative disc disease of the cervical spine, mild degenerative disc disease of the lumbar spine and obesity (R. 16).  He further found she possessed the RFC to perform a modified range of light work, except over-the-shoulder work (R. 18); thus, she was not disabled (R. 20).

Smith-Richardson sought review of the decision (R.8-10) but the Appeals Council denied her request on February 21, 2013 (R. 1-7).  Accordingly, the decision became the final decision of the Commissioner.  Smith-Richardson filed the instant appeal for judicial review.

Smith-Richardson contends:

1. The ALJ's decision is not supported by substantial evidence; and,

2. The Appeals Council erred in failing to remand or enter a favorable decision.

## Eligibility for DIB

To qualify for DIB, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits and be under a disability as defined by the Social Security Act.  42 U.S.C. §416(I), §423.  Establishment of a disability is contingent upon two findings.  First, the plaintiff

must be found to suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §423(d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed in any other substantial gainful employment that exists in the national economy.  42 U.S.C. 423(d)(2).

Pertinent Facts

Medical Records

Smith-Richardson was seen at the Alexandria Veterans Affairs Medical Center ("VAMC") from April 2006 to June 2008 regarding complaints of neck and back pain stemming from her work related injury (R. 412-427).  As early as September 2006, she was diagnosed with mild degenerative disc disease of the lumbar spine (R. 424) and as early as October 2006 stenosis was evident at several levels of her cervical spine (R. 422).

In February 2007, a MRI was performed on her lumbar and cervical spine.  Though the lumbar spine appeared normal, the impressions from the MRI of her cervical spine showed she suffered from moderate disc and degenerative disease.  Of note was  "the most pronounced finding at C4-C5" which consisted of a focal moderate central disc protrusion with flattening of the thecal sac and the most significant narrowing of the spinal cord at that level.  Less notable were the narrowing of the cervical spine

4

throughout and the existence of posterior ostephytes on the left side at levels C3/C4 and C5/C6  (R. 338-39).

A follow up MRI performed on her cervical spine in June 2008 revealed multi-level cervical degenerative disc disease with a new appearance of disease at C6/C7 as well as cervical spondylosis (R. 334-35, 413).  A MRI performed at the same time on her lumbar spine showed a new instance of degenerative disc disease at L1/L2 (R. 336, 414).

Smith-Richardson was evaluated by neurosurgeon Bradley J. Bartholomew, M.D. in October 2008.  The physical exam showed she had normal strength in all extremities.  Her straight leg testing was positive at approximately 70 degrees and sensory was decreased in her left arm and leg in a non-dermatomal distribution.  Her neck exam revealed more tenderness on the left side than right and no spasm was noted.  Her range of motion in her neck and back was nearly non-existent.  Dr. Bartholomew's review of prior MRIs led him to conclude that C3/C4 and C4/C5 levels were worse than C6/C7 and the lumbar spine appeared normal.  Accordingly, he recommended trying steroid injections, a muscle stimulator and EMGs and nerve conduction studies of the upper extremities (R. 367-68).

Smith-Richardson received post bilateral 4-5 and 5-1 facet blocks in December 2008.  She reported no relief at all and continued to complain of neck and back pain and more frequent headaches.  However, she reported the muscle stimulator helped her.

Dr. Bartholomew again recommended upper extremity EMGs and nerve conduction studies as well as possible steroid injections in the lumbar and cervical spine (R. 379).

Neurologist, Morteza Shamsnia, M.D., examined her on April 24, 2009.   The examination revealed "spasm in the cervical and lumbosacral spine with loss of lordosus in both cervical and lumbosacral spine." (R. 460).  He also noted that she walked with a cane, was in pain, had a limited range of motion and walked with caution due to pain (R. 462).  Accordingly, he referred her for a MRI of her cervical and lumbar spine, EMG and nerve conduction studies of the lower extremities and a DEP/SEP of the upper and lower extremities (R. 462).  Accordingly, a MRI was conducted May 7, 2009.

The MRI of her cervical spine showed herniation and bulging at several levels.  The radiologist noted a pattern of muscle spasms when she was placed in an erect, weight bearing, neutral posture (R. 395-97).  The MRI of her lumbar spine showed herniation at L1/L2, bulging from L2/L3 though L4/L5 and lumbar facet arthrosis without critical lateral recess or neural foramina stenosis at L5/S1.  As with the cervical spine, a pattern of muscle spasm was noted when she was in an erect, weight bearing, neutral posture (R. 395-400).

After reviewing these films, Dr. Bartholomew provided an addendum to his prior report stating he did not see anything

surgical on her lumbar spine but the films "show[ed] a horrible looking cervical spine" with "herniations at every level in her neck." He further opined that she was a "candidate for a multilevel surgery." Dr. Bartholomew "recommended doing an artificial disc at five levels." (R. 406).

Smith-Richardson returned for a follow up with Dr. Shamsnia on July 24, 2009. He noted "she had evoke potentials and EMG studies of the lower extremities performed....The studies were abnormal consistent with left S1 radiculopathies. The EMG and nerve conduction studies as well as evoke potentials of the upper extremities also were abnormal consistent with a right carpal tunnel syndrome and [left] C5-C6 radiculopathies."[1] (R. 429). Dr. Shamsnia also noted the MRIs showed "disc herniation in both regions, in the lumbosacral as well as the cervical spine." He advised she "should be off of work on a total disability status until further notice" and she should consult Dr. Beaucoudray regarding pain management and injections (R. 429).

Smith-Richardson met with Dr. Beaucoudray on August 4, 2009 (R. 575-78). During the examination, Dr. Beaucoudray found she had "exquisite tenderness" of the muscles next to the cervical spine and the tenderness extended to both of her shoulders where

---

[1]  Dr. Shamsnia's progress note states "right C5-6 radiculopathies" but testing shows and Dr. Bartholomew's note confirmed is was abnormal consistent with left C5-6 radiculopathies (R. 401, 406-07).

7

"moderate spasm" was noted (R. 577). Additionally, he found tenderness of the muscles next to the thoracic and lumbar spine and detected "moderate spasm" near L5 (R. 577). He also found her muscle strength was 5/5 in all extremities and her reflexes were normal. Straight leg raises were positive on both sides and her gait was antalgic[2]. She used a cane for ambulation and support (R. 577). He confirmed her EMG and nerve conduction studies showed cervical and lumbar radiculopathy and he suggested a left L5 and S1 transforaminal epidural steroid injection (R. 578).

On September 1, 2009, Smith-Richardson returned to Dr. Beaucoudray's office for a follow up examination (R. 573-74) He found her to be in the same neurological condition in that she still displayed tenderness upon examination, her motor and sensory remained intact, her reflexes were equal and symmetrical, she continued to walk with a antalgic gait and she still used a cane for ambulation and support (R. 573).

Thereafter, she met with Dr. Bartholomew on two occasions to discuss surgery (r. 566, 588). Ultimately, she opted to proceed with a four level artificial disc replacement (C3/C4, C4/C5, C5/C6 and C6/C7) despite being advised there were no guarantees and she might require additional surgeries (R. 588).

On October 8, 2009, Dr. Beaucoudray performed a left L5 and S1 transforaminal epidural steroid injection (R. 572). Smith-

_____

[2] That is, she walked in such a way as to avoid pain

Richardson reported on October 23, 2009, that the injection provided relief for two or three weeks. She further reported that she did not have to use her medications during that time. However, the pain returned approximately three days prior to her appointment. There was no change in the intensity of her pain (R. 582). Upon physical examination, she showed tenderness. She had a positive straight leg raise on the left, was seen frequently readjusting in a chair to manage pain and discomfort and used a cane for ambulation and support. Her motor exam remained intact and her reflexes remained normal (R. 582).

On November 9, 2009, John P. Sandifer, M.D., an orthopaedic surgeon contacted by Worker's Compensation for a consult, issued an opinion. He recommended anterior cervical fusion at C5/C6 and C6/C7 but did not feel intervention at C4/C5 and C3/C4 were warranted. Dr. Sandifer also found that Smith-Richardson should not return to work when considering her symptoms, physical problems and the medications she was taking (R. 587-89).

On December 16, 2009, she saw Dr. Shamsnia. She continued to complain of headaches, neck pain, leg pain and insomnia and her neurological exam showed spasm in the cervical and lumbosacral spine without significant limitation to her range of motion (R. 598).

On January 21, 2010, Smith-Richardson met with Dr. Bartholomew for a pre-op visit regarding a C5/C6 and C6/C7 anterior cervical

discectomy and fusion.  Dr. Bartholomew recommended the discectomy
and fusion after he could not obtain approval from Worker's
Compensation for an artificial disc replacement.   Though Dr.
Bartholomew knew the surgery would not alleviate all of her pain,
he acknowledged it would allow mobility in her neck and would
address her radiating arm pain (R. 592).  Ultimately, the surgery
was not performed as Worker's Compensation again denied payment for
the procedure (R. 590-91).

Smith-Richardson returned to Dr. Beaucoudray in March 2010 and
he continued her on her prescription medications (R. 590).  At her
June 12, 2010 visit, Dr. Beaucoudray noted her complaints of pain
remained consistent, her neurological status remained constant and
the objective findings justified the use of her treatment plan (R.
628-629).   In August 2010, he noted her continued complaints of
pain and a request for a steroid injection (R. 626).  By November
2010, Smith-Richardson, who denied any change in the overall
quality of her pain and showed no change upon examination, was
approved for the injection (R. 624).  The injection was given by
Dr. Beaucoudray on November 23, 2010 and Smith-Richardson reported
some benefit (R. 623-24).

On February 18, 2011, she returned to Dr. Beaucoudray's office
with complaints of chronic pain (R. 621).  She was "notably
uncomfortable in the seated position", exhibited tenderness upon
examination of her cervical spine, had restricted range of motion

of her cervical spine in all directions secondary to pain and though her motor exam was intact and reflexes were normal, she complained of numbness in her upper and lower left extremities. Dr. Beaucoudray recommended another cervical epidural injection and scheduled it for May 19, 2011.

Smith-Richardson arrived on May 19, 2011 for the cervical epidural injection. She requested anti-anxiety medication prior to the procedure but it could not be administered because her blood pressure was too low. She elected not to undergo the procedure without the medication and to reschedule. Dr. Beaucoudray instructed her to continue her prescribed medications and return to the clinic for follow up in three months (R. 619-622).

2009 Hearing

At the time of the first hearing, Smith-Richardson was 46 years old (R.29). She lived with her mother, husband and four year old, autistic grandson (R.30). In-home health care providers and sitters cared for Smith-Richardson's mother (R. 31) and government assistance paid for a part time care giver for her grandson (R. 32). Smith-Richardson could not perform most of the household chores and relied on these care takers and her husband for help. She could do some shopping if she used a scooter and had someone accompany her (R. 52-53); however, she could neither sweep nor keep up with laundry (R. 42-43). She also had trouble maintaining her hair or nails. She used a cane to walk and a stool in her kitchen

11

due to instability (R. 51).  She drove no more than two or three days a week and when she had to drive to her doctor appointments in Metairie, LA, she stopped frequently due to pain (R. 39, 44).

Smith-Richardson complained of chronic back and neck pain, daily headaches, instability from numbness in her legs and left arm and an inability to stay awake due to the number of narcotics she took to manage her pain (R. 36-39, 45, 47-48, 51).  Smith-Richardson initially managed her pain through physical therapy and the use of non-narcotic drugs but they provided little relief (R. 51-52).  In December 2008, she received her first epidural injection (R.37) and though she was a candidate for surgery on her cervical spine, Worker's Compensation refused to pay for the surgery (R. 37).[3]  Accordingly, she obtained prescriptions for various medications from her pain management doctor, Dr. Beaucoudray.  At the time of the hearing, she took Hydrocodone four times a day, Diclofenac two times a day, 600 mg of Gabapentin three times a day for neuropathy and 3 tablets of Zanaflex two times a day (R. 36-37).

Smith-Richardson obtained a diploma from Delta Business College in 1990 as a medical secretary and completed three semesters of LSUA toward an associates degree in nursing.  She worked in the patient care field for a number of years (R. 34).

---

[3]  Smith-Richardson testified that the FDA denied the surgery as too risky but other references in the record indicate it was really a decision made by Workers Compensation.

She worked at VAMC as a nursing assistant when she sustained an injury to her back (R. 35). She could no longer perform the work and was moved to a sedentary position in the pharmacy answering the phone and inputting prescription requests (R. 36, 47). Smith-Richardson testified the pharmacy job was difficult in that sitting at her desk all day caused her pain, she could not take her pain medication because it made her drowsy and her pain adversely affected the way she interacted with her coworkers and supervisor (R. 47-48, 53-54).

The VE testified that a person Smith-Richardson's age with the same education and work experience who could lift and carry 20 pounds occasionally and ten pounds frequently, sit six of the eight hours in a work day, stand and walk six out of eight hours but could not perform over-the-head work was able to perform the job of a pharmacy clerk. Additionally, the VE stated he believed the position of pharmacy clerk provided for a sit/stand option. However, the VE opined that a person with pain limitations, who could not follow one and two step instructions would not be able to perform the work of a pharmacy clerk.

2011 Hearing

At the time of the 2011 hearing, Smith-Richardson was 48 years old. Both her mother and husband had moved out of the home (R. 67-68, 77-78). She quit her job with the VAMC pharmacy in 2008 because she could no longer sit for long periods (R. 71). She scheduled

her neck surgery on three separate occasions but each time Worker's Compensation refused to pay (R. 72).   She continued to see Dr. Beaucoudray and he managed her chronic pain and other symptoms with medications and injections (R. 73).   However, Smith-Richardson felt the relief was only temporary and she still suffered from migraine headaches (R. 87-89).

Smith-Richardson  testified  she  could  lift  10  pounds  and perhaps 15 (R. 72).   She could sit 30 to 35 minutes before she would have to change positions (R. 72) and she continued to use her cane on a daily basis because of the shooting pain in her legs (R. 71-72).

She further testified she received assistance with her daily activities because she was unable to carry anything heavy and couldn't keep up with chores (R. 74,82).   She advised that she went go to the grocery store but she used a scooter and usually as accompanied by her cousin who came to the house to help care for her grandson and assist with chores (R. 74-75, 80-81).   Smith-Richardson read to her grandson and attended school conferences with her cousin but she did not help him with homework or play with him (R. 75).   Her driving was limited to an average of two times a week and her main activities included attending church on Sundays and visiting her pain management doctor every three months (R.76).

The VE testified a person of claimant's age, education and work experience who could lift and carry 20 pounds occasionally and

14

10 pounds frequently, could stand and walk for six hours and could sit for six hours but could not do over-the-shoulder work would be able to do sedentary work.  Such work would also be available if the person could only stand and walk for two hours and sit for six. Suggested sedentary positions were those of egg processor and atomizer assembler (R.91).  The VE opined that work was not available if the person was interrupted by distractions as the positions did not provide for unscheduled breaks (R. 94).

<u>ALJ's Findings</u>

To determine disability, the ALJ applies the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process requires the ALJ to determine whether the claimant (1) is presently working, (2) has a severe impairment (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1), (4) is unable to do the kind of work she did in the past, and (5) can perform any other type of work.  If, at any step of the process, the ALJ determines the claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994), *cert. den.*, 914 U.S. 1120 (1995), citing <u>Lovelace v. Bowen</u>, 813 F.2d 55, 58 (5th Cir. 1987).

To be entitled to benefits, an applicant bears the burden of

showing she is disabled.   Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis.   Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.   Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found Smith-Richardson has not engaged in substantial gainful activity since August 20, 2008 (R.16) and has a severe impairment of degenerative disc disease of the cervical spine and mild degenerative disc disease of the lumbar spine and obesity (R. 16).   However, the ALJ found she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (R.17).   The ALJ also found Smith-Richardson is able to perform her past relevant work as a pharmacy clerk (R.20).

At Step 5 of the sequential process, the ALJ found Smith-Richardson had the residual functional capacity to perform a modified range of light work as defined in 20 C.F.R. §404.1567(b) with the exception of over-the-shoulder work.

<u>Law and Analysis</u>

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there are any prejudicial legal errors.

McQueen v. Apfel, 168 F.3d 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Smith-Richardson v. Perales, 402 U.S. 389, 401 (1971).  It must be "more than a scintilla and less than a preponderance."  Id.

Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include scrutinizing the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority to set aside factual findings that are not supported by substantial evidence and to correct errors of law.  Dellolio, 705 F.2d at 125.  To make a finding that substantial evidence does not exist requires courts to conclude that there is a "conspicuous

17

absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

Smith-Richardson contends the ALJ's denial of her claim is not supported by substantial evidence. She takes particular issue with the ALJ's finding regarding her credibility as to the intensity, persistence and limiting effects of her symptoms and his determination that she possessed the residual functional capacity to perform a modified range of light work.[4]

The ALJ gave great weight to the RFC assessment provided by the non-examining orthopaedist, Dr. Dzurik, in January 2009 (R. 383-390) and gave little weight to the report prepared by examining orthopaedist, Dr. John Sandifer, in December 2009 (R. 586-589). The ALJ advised that Dr. Dzurik's RFC assessment was in line with the objective medical evidence. This statement is curious considering the majority of the objective medical evidence was never reviewed by Dr. Dzurik.

Dr. Dzurik's assessment was based upon medical evidence revealing the treatment rendered from June 2004 though December 2008. During the nearly eleven months between the time Dr. Dzurik issued his report and Dr. Sandifer issued his, Smith-Richardson underwent MRIs, EMGs and nerve conduction studies. She received epidural steroid injections and she was evaluated by Drs.

---

[4] See ALJ's decision (R. 18-20).

Bartholomew, Beaucoudray, Shamsnia and Verma.

In the nearly two years after Dr. Sandifer issued his assessment, Smith Richardson continued to complain about her pain and seek relief. She scheduled three surgeries, all of which were denied by Worker's Compensation. She underwent epidural steroid injections. She continued to follow up with her doctors and follow their suggested treatments but none of that information was considered by any of the physicians who issued an opinion as to her RFC.

Moreover, the reasoning given by the ALJ for affording little weight to Dr. Sandifer's opinion is not supported by substantial evidence. First, the ALJ states that Dr. Sandifer's examination does not support his opinions, but Dr. Sandifer makes clear in his report that his opinions are based upon the entirety of Smith-Richardson's medical records. Second, those medical records show she did in fact have a herniated disc at L1-L2 of her lumbar spine; her complaints of pain, tingling and numbness in her extremities were supported by results of EMGs and nerve conduction studies showing abnormalities in her upper and lower extremities; and, MRI results, examinations by her treating physicians and prescriptions for medications prove the existence of muscle spasms.

Furthermore, the ALJ's determination regarding Smith-Richardson's credibility is not supported by substantial evidence. The basis of that finding was the "inconsistencies" the ALJ found

19

between "the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms" and the residual functional capacity assessment that she could perform a modified range of light work (R. 18).  If the RFC is not supported by substantial evidence, then the credibility determination is not either.

Accordingly, as the final decision of the Commissioner is not supported by substantial evidence,

**IT IS HEREBY RECOMMENDED** that Smith-Richardson's appeal be **GRANTED**, the final decision of the Commissioner be **VACATED**; and, Smith-Richardson's case be **REMANDED** to the Commissioner of Social Security for further proceedings consistent with the views expressed herein and those contained in the Appeals Council's order dated March 2, 2011.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the clerk of court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before making a  final ruling.

FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this _____ day of May, 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE